Good morning, your honors. John Burton for the plaintiffs, and it is pronounced Chinaryan. Chinaryan, thank you. China-ryan, it's sort of easy to spell. And I'd like to reserve as much time as I can for rebuttal. How many minutes are you hoping? All right. So I'd like to cut to the chase here. The, with what I think is the applicable law that was not applied throughout the case, and it was established 27 years ago in this circuit, Washington v. Lambert, and bear with me if I could just read just a couple passages from that case. All people have a right to be free from the terrifying and humiliating experience of being pulled from their cars at gunpoint, handcuffed, or made to lie face down on the pavement when insufficient reason for such intrusive police conduct exists. The police may not, may not employ such tactics every time they have an So what we have here is a Terry stop based on reasonable suspicion that a car was stolen. It turns out the car was not stolen because reasonable suspicion is something far less than probable cause. And when officers act on reasonable suspicion, the Fourth Amendment, according to this circuit, applies certain limitations on what they can do. And again, to read the applicable passage from Washington v. Lambert, which 27 years ago established the law on this. This is a quote. Under ordinary circumstances, when the police have only reasonable suspicion to make an investigatory stop, drawing weapons and So, Counsel, I think that's one of the key quotes in the law for the disposition of this case. And what I'm, what I'm trying to figure out in thinking about the qualified immunity issue is, while that statement seems to be clearly established through Washington and then later Greene, what is clearly established about when we're looking at ordinary circumstances versus when we're looking at non-ordinary circumstances? Because that's the, that's the line in that quote, right? Under ordinary circumstances, if all you have is reasonable suspicion, drawing weapons, using handcuffs violates the Fourth Amendment. So this ordinary circumstances qualifier seems to me to be the important thing that we're trying to figure out. Does this case match that or does it not match that? I think that's absolutely correct, Your Honor. I think we're right on the same point. And again, to turn to Washington v. Lambert, which itself rejected qualified immunity, as did Greene, for the officers. It says, despite the absence of a bright-line rule, our cases make clear that we have only allowed the use of especially intrusive means of effecting a stop in special circumstances, such as, and then there are four listed. So is your argument that that's a, that's a complete list? Only those four? Well, I got taken for task on this. What I did was, I directly quoted the court's order on summary judgment. And, which is, these are the four that are listed in Washington v. Lambert. These are the four that are listed in Greene v. City and County of San Francisco. No, I get that, but what I'm asking is, legally, are those the only four? Because in the background here, we're always looking at a totality of the circumstances test. So is your position, as plaintiff's position, that the law really does clearly establish those are the only four circumstances that get you out of ordinary? No, not at all. And in fact, that's why the court, when they're fashioning these rules, and I know Judge Thomas was on the Greene panel, wrestled with this, want to make sure that police have at their disposal the necessary tools to protect themselves when engaged in investigatory stops. So if there's another special circumstance that's not on this list that could be articulated, then that could, in fact, allow these intrusive tactics on a Terry stop. But what do you have here? You have the fact that it was daytime, not safer. The second is that the windows were tinted. Well, tinted windows, especially on commercial limousines, are ubiquitous. But let's follow the logic of tinted windows as a special circumstance. The occupants of the car were ordered out of the car. They were 100% compliant. In fact, in terms of is the potential risk that the officers might face before they know whether they're going to have compliant people that they're dealing with or not, right? So that seems to me that's relevant, because at the outset of this, they're looking at this kind of car. It's a big car, could hold a lot of people. It's got tinted windows, no way to tell how many people are in there. So then the stop happens, and then at some point they realize there isn't eight people in that car or whatever. But from the outset, we have no idea how many people are in that car. Isn't that something that officers are going to think about and reasonably so? Absolutely. But let's follow the logic of this. The windows are tinted. They know there's two females in the front seat because officers, Gonzalez and Menzies, have seen that because they drove from the other direction before they did the U-turn. They, from positions of cover, like they're trained, they order the occupants out of the car. The occupants get out of the car. They don't, at that point, say, is there anybody else in the car? Now, they are not blocked by the tinted windows. They're fully visible. At that point, Ms. Chinarian is made to lie in the street for three-and-a-half minutes, and the others, who are fully visible, are handcuffed. The officers clear the car and see there's no one else in it. There's no problem with that. The problem is what they did to these people after they complied and got out of the car. But that's what... I wanna be really clear about your argument. Is that right? That you think the original stop and how they set this up and the plan that the sergeant formed in his mind before the stop occurs is all fine up until the moment that they know there aren't a bunch of people in that car, and then that's the moment that you know the violation happens? I think that once they pointed guns at them and once they had Ms. Chinarian lie in the street for three-and-a-half minutes, and once they put all three of these women in handcuffs, they violated the Fourth Amendment. Okay, so then that answers my question about... No. No, it did not, because there was obviously this coincidence that a similar looking car that actually had a low jack device on it, which this one didn't and didn't activate, had been stolen before, and then there was this DMV error that no one could really anticipate. The license plate just had a one digit mistake. So the stop was valid. The LAPD... And this is really where I think this court... I would ask this court to look at this very closely. The LAPD has a stop they call an investigatory stop, and it was described by our expert, it's described in the brief. The officers have adequate resources. Here there were 13 officers in a helicopter, but you get adequate resources. The doors are ballistic. The officers can stand behind the door. They're free to take the guns out of their holster, as long as they're pointed at the ground. They order the people out of the car. The people can hold their hands up. They can actually be directed to turn around to see whether they're armed or not, then move away from the car. Then the officers can approach the car, which now has open doors, with their guns out, and see is there somebody in the car who's not compliant, who's not coming out as ordered. All this can be done without the intrusive measures that were being used on these plaintiffs. Sergeant Cueto actually did not order all these things to happen. He just said, oh, I've got the possible stolen car, calls in a bunch of backup, and then they did this because this is what they do to everybody. That's why this went to trial. I'm not here on a qualified immunity issue, although we've raised that. We're here on a Monell trial, because this is what they do to people. And then when this came up during the trial, the defense expert, Edward Flosie, testified, well, this is what post trains officers to do for stops of suspected stolen vehicles. And as the court can see, and I put it in the brief, there was a colloquy with the district judge. And I said, that's directly contrary to Green, which says the Washington versus Lambert standards apply to reasonable suspicion for stolen vehicles. A suspected stolen vehicle is not the kind of crime that automatically triggers these extreme measures during Terry stops when there's no probable cause to arrest. And the response from the district court was, well, post can train something that is not consistent with the Ninth Circuit. And when it came to the jury instruction, I said, the jury needs to be told that when there is a Terry stop, as opposed to probable cause to arrest, the general rule, under ordinary circumstances, these extreme measures, pointing guns at people, handcuffing them, making them lie in the street, are not allowed. The jury instructions presented the special circumstances as an exhaustive list. And I thought that in response to Judge Forrest's question, that you're saying that it's not an exhaustive list. But I know you wanted to save time, and you're down to a little over three minutes. Just let me say about that. The jury instruction that I submitted was lifted verbatim from the district court's summary judgment order, saying, this is the law that, under ordinary circumstances... And I actually deliberately lifted his quote so he couldn't say that's not the law, because that's what he said the law was. It would have been easy if somebody wanted to modify, put in such as, or an additional factor. So, yes, thank you. I'll reserve my last few minutes. Thank you. Good morning, Your Honors. My name is Sarah. You guys will represent the defendants in this manner. Can you speak up, counsel? Oh, I'm sorry, Your Honor. We've been having some sound issues this week. Okay. I'm sorry. I'll try to speak up. Maybe you can move the mic closer. Oh, sure. I'm sorry. So, I'm glad that Mr. Burton mentioned that there was a Minnell trial here, because that's what I'd like to discuss a little bit with the court this morning. Unlike in Green, here, a properly instructed jury found that there was no Fourth Amendment violation arising from the high risk stop. I'm looking at the verdict form, and how do we tell from the verdict form that the jury found no constitutional violation at all versus that there was a constitutional violation except it wasn't pursuant to any official policy and practice? Just the way the question was presented here. Did the police officers acting individually or together, while following an official policy practice or custom, deprive the plaintiffs of the Fourth Amendment rights? So, the way it's phrased, checking an answer no doesn't really answer the question. Well, I can lay a little... Oh, I'm sorry, Your Honor. I can lay a little foundation and answer the court's question. So, the jury was instructed that the LAPD had an official policy that allowed officers to conduct a high risk stop of suspected stolen vehicles after considering the totality of circumstances. And that's at jury instruction number 23 on the city supplemental excerpts of record 32. Then, the jury was further instructed that the officers acted pursuant to that policy when they detained the plaintiffs. Again, jury instruction number 22... I'm sorry, 23 at SER 32. So, the jury did receive that information. The jury was directed to understand and accept that when the officers detained the plaintiffs, they were acting pursuant to that policy. And the jury saw... So, let me back up. I just wanna make sure that I understand your arguments on this point. You're saying that... Let's assume that we do find that qualified immunity was improperly granted to the officers. The verdict form, as it stands, still stands for the proposition that the jury found no constitutional violation despite the wording because of the way the jury was instructed? Exactly. That's exactly my point. And the jury did see all the body worn videos here. They heard from all the plaintiffs. But the verdict form itself is ambiguous, right? I wouldn't say it's ambiguous given how the jury was instructed. The jury was told that the officers were acting pursuant to this policy that allowed them to conduct a high risk stop of a suspected stolen vehicle after considering the totality of circumstances. And they found no, and they didn't struggle either. And the jury instructions were also perfectly appropriate here. They instructed the jury to take in consideration the totality of the circumstances and the intrusiveness of the stop. And the jury was told that they should, in determining whether a seizure was reasonable, they should consider the number of officers present and whether weapons were displayed. They were also instructed to consider the methods used in conducting the stop, the length of the stop. And in determining whether or not the plaintiffs were subjected to excessive force, they should consider the nature of the crime at issue, whether the plaintiffs posed a threat to the officers, and whether the plaintiffs were resisting or attempting to flee at the time of the stop. And those considerations are almost identical to the four Washington factors. And nonetheless, the jury still found that the officers acted lawfully here and didn't deprive the plaintiffs of their constitutional rights, even though it was undisputed that the plaintiffs weren't armed, uncooperative, or violent during the course of the stop. And just to talk a little bit about, address a little bit about what Judge Smith says. In our case, we contend that green is very distinguishable, both procedurally and factually. And that when we start talking about, well, here the windows were darkly tinted, nightfall was approaching, things like that, green doesn't cover those circumstances. And although... But the windows were tinted, but the officers saw before they effectuated the stop that there were two women seated in the vehicle, is that right? Well, that's a little interesting. Not necessarily. They saw through the windshield, but they didn't see the third person in the back seat. And so the jury heard that when Officer Manessis, and this is on the body worn, by the way, and the jury heard this, that when Officer Manessis ordered passenger exit the vehicle, two people came out to his surprise, both the front passenger and the back seat passenger. So they didn't know how many people came out. And then they had them walk backwards to them so they could do a little cursory pat down and detain them briefly. And so that's another interesting point here, is that because the windows were so darkly tinted, the officers didn't know how many people were in there in this large, full size suburban. But I wanna emphasize something though. The officers didn't conduct a high risk stop of this vehicle because the windows were darkly tinted. They conducted a high risk felony stop after consideration of a totality of the circumstances. That's not in dispute that they took those, the totality... Yeah, but it comes down to what is that totality that they're thinking about. And I think... I'm having a hard time reading our case in Washington and then the Green decision to say, to not say, suspicion of a serious felony charge isn't enough. You've gotta have something else that sort of indicates you've got a reasonable ground to be concerned for your safety as officers. So what is... So they have clear suspicion, I think probably stronger suspicion in this case than in Washington or Green in terms of what they thought the criminal activity might be. So that's really strong in their favor. But then what's the plus? What's the... What else? And it's the tinted windows and what? Their training and experience. So the officers... But that comes back. The training and experience is tricky, right? Because that comes right back to, we suspect this crime and in our training and experience, this crime means people who are violent do this crime. How do you make that argument with Washington and Green that says, suspicion of a particular crime isn't enough? I mean, Washington in particular, the suspicion of the crime there was armed robbery. There was no ambiguity about whether that suspected crime would be violent or not. Here, that's not true. I mean, you can steal a car in a violent way or a non violent way. Well, the officers testified... Well, unlike Green... I mean, sorry, unlike Washington and Green, the officers did as much investigation as they could before pulling over this vehicle and they needed to look at the registration and the VINs to determine whether or not it was, in fact, stolen. So those two cases, improper investigation, inadequate investigation on the part of law enforcement. But the officers did testify and the jury did hear that the officers had specific experiences when they pull over suspected stolen vehicles of recovering tools and weapons and tools that could be used as weapons and how the car can be used as a weapon. Well, let me read you this passage from Green. It says, while the crime at issue, stolen vehicle or plates, was arguably severe, there was no indication at the scene that Green posed an immediate threat to the safety of officers or other. Were there circumstances here that indicate that the driver or passengers, for that matter, posed an immediate threat to the safety of the officers? Well, they didn't know. I mean, they didn't know until they pulled everyone out and cleared the vehicle themselves. And if you watch the body worn, you see the officers saying, hang on, we gotta clear this trunk before we determine that the car is completely empty and that the situation is, we've got this under control. And once they pulled all the occupants out, were they continually detained and handcuffed? Yes, during the course of the... While the officers investigated the license plates. Yes, they were. And then was there anything that justified that? Well, they were continuing to determine whether or not the car was stolen. So the officers testified they'd never seen that situation before where the license plate is wrong as a result of DMV negligence and it's associated with a completely different car. So they had to check the VIN numbers and the registration to determine that it actually belonged to Ms. Chenarian's husband. And there was a discussion of they had to look at the VIN inside the car, in the engine block, look at the registration, look at all these things to determine what exactly happened here in this very bizarre situation, which they've never encountered before. So unless the court has any further... Oh, I'm sorry. Are there any Washington Green factors here that come into play? Whether or not they were armed or violent or uncooperative? They were not violent, they were cooperative, right? No, there's no... They didn't have any weapons. No, but... So basically it comes down to the fact of the tinted windows. That's the only other factor here, right? Well, the car was... I'm sorry. The car was very large. They didn't know how many people were in it. They couldn't see what they were doing. Nightfall was that at the time of the stop, it was around sunset, but by the time it was dark, and the officers testified that if one of them fled, they'd have a very hard time recovering that person. But they didn't look like they were going to flee, did they? Not... They were cooperative. So I understand, but also the Washington factors wouldn't put a reasonable officer on notice that what they were doing was illegal, given that it was not an exhaustive list, it's such as. And the officers did... What would you add to the list? What would I add to the list? I would add that... I would add to the list that you have specific information that you're stopping the proper suspects. And here we had that very type of evidence. They were looking for this almost identical car in this particular area of Sunland, Tujunga. And so how is that different from Green? In Green, there was really no investigation. There was unconfirmed ALPR hit, and the officer there could have run the plate before pulling this person over and subjecting her to a high risk stop, but never bothered. And the same in Washington. The officers could have done more of an investigation to determine whether or not they were stopping the proper suspects, but just were unreasonably declined to do so. And that's very different than what we did here, which is we did as much investigation as we could, the officers did, before stopping these subjects. Unless the panel has any more questions. Well, I guess I have one other question. I don't know. Trying to make sense of your argument. It seems that you're saying that a sort of generic level of knowledge about a particular type of criminal activity can be enough to be the sort of take us out of the ordinary circumstances, that you don't need knowledge specific to this situation that you're in. Is that your argument? That specific knowledge that the officers... I'm sorry. Because I think it's specific information about the people in that car. They have specific information about the car. They have no specific information about the people in the car, or how dangerous they may or may not be. Like you might have in other circumstances where maybe you saw somebody before they got in the car and you saw them do something that would heighten, oh, this person might be violent or uncooperative or whatever. We don't have any information specific to the people involved in this situation until they come out of the car and then we see them, right? So that's my point is, you argued these officers get to rely on their training and experience that vehicle theft is dicey, and interacting with people who are suspected of that is dicey. Probably so. But there's nothing that I can find in this record that gives them information specific to this circumstance. And so I come back to, does the law allow us to have this sort of generic safety concern? Or do you need a specific to this situation? And I read Washington and Green to say, we need something specific to this situation. We're not gonna create generic, like, if you suspect somebody of assault, always go and do this, what I think they called it, a felony stop. Well, we do have specific information that they're in the particular area where they are looking for actively searching for this stolen vehicle. So we know that. We have a lot of facts that lead them to  doesn't say that the officers always have to do a high risk stop. It's that they're allowed to, after considering the totality of circumstances, which the officers did consider, and they discussed that before the jury and in their declarations in support of the summary judgment motion. But the passage I read you from Green requires that there be some indication that the particular suspects pose an immediate threat. So I'm not sure I've heard anything beyond the tinted windows and that they didn't know who else was in the vehicle. We wouldn't know what type of threat they posed to us until we actually stopped them and cleared the vehicle. But that's the point that I'm trying to get at, right? Is the extraordinary circumstance test met when officers have a reasonable concern of the possibility of fear? Right? We don't know what we're facing, so it could be dangerous. Versus, do they have to know that something dangerous might happen because of something specific? I think that they had, in this instance, I think they had enough, they knew enough that they reasonably believed that they were stopping the proper suspects. They had a lot... Right, but this case might be different if they had information about how this car that they thought was the stolen car, how it was stolen, and that it was stolen at gunpoint. And then maybe you would have a different calculus because then they would know something about the suspects they think they're about to encounter. But we don't have anything in the record to know how this car became stolen or that the people who did it are inherently violent. That's my point. No, I understand that point. The officers are trained and their experience shows them that the people who are car thieves are sophisticated, advanced criminals who use high-risk tactics. And the officers relied on that, among other facts, to determine to use high-risk tactics to stop the vehicle. Can you clarify something? When the officer pulled the driver out, could he tell right away that she was unarmed? No. She was wearing very... She was wearing tights and a t-shirt. From the video, it seemed fairly clear that there was no place that she could hide a weapon. So once she was... What does the record suggest on that? The record shows... What the body worn shows is that she came out of the vehicle and she was asked to get on the ground, prone out. And she was wearing tight clothing, but they don't know if she's gonna flee. I thought there was testimony at the trial. Now, granted, now we're going back and figuring out the summary judgment standard that the officer could tell she was unarmed. I don't think they ever contended that. They did still search her, pat her down afterwards to determine that she didn't have any weapons, but they didn't definitively determine when she stepped out of the car, okay, this woman's unarmed. I don't think there was anything to suggest that on the part of the city. Alright. Our questions took you over time. I wanna see if my colleagues have any additional questions. Judge Thomas? Just one. Is there any suggestion in the record that the tinting was illegal? Yes. Yeah. The officers did testify that's a legal tint. So I thought under California law, you could tint your rear windows. Is that right? Well, this is a very, very dark tint. So I think that it's an illegal... It's darker than what's allowed on the back windows. And I think it was also on the front. Not the windshield, but the front. Okay. Alright. Thank you. Alright. Thank you, counsel. The tint was legal. There is nothing in this record that would suggest there's anything illegal about the tint. There's limits on the amount of tinting that can go on a front window and on the front side windows. These are the rear windows. At four inches or something? Is that right? There's some technical measurement. I'd like to just really address this question of what the law of the circuit is. When this case came to my office, I don't wanna talk too personally about it. They can't do this because I read the Green decision when it came out, and I was already familiar, long familiar with Washington versus Lambert. And this is a problem because the LAPD, and they're not the only department that does this, tells its officers, you have a possibly stolen car, go to these really maximum high risk tactics because there's all sorts of gradations in between. This woman had to lay in Foothill Boulevard for three and a half minutes with her cheek on the sidewalk, spread eagle, that you can do this. And what the essence of the Monell claim, the way I saw it was, is that the officers do this and they're not even trained on these Washington versus Lambert factors. I was on this from the beginning, and I asked... Press Council's argument that despite the way the verdict form is phrased, given the jury instructions, the jury necessarily found that there was no constitutional violation? I think the jury found... It'd be kind of a no harm, no foul type of argument. I think the jury found no constitutional violation because they were told that this is how police officers do it, and they were not told that the Ninth Circuit says it requires a special circumstance, something more than just a stolen car. That's what I think that green means, that just because there's reasonable suspicion of a stolen car doesn't trigger these extreme tactics during Terry stop investigations while a VIN is being checked. And in terms of their cooperation, Sergeant Cueto saw this car drive by and said, who would think that this car we thought was in a chop shop last night is now driving by? Well, they're different years, but same model, same color standard. We've seen these 100 times, these suburban limousines. And he followed for 10 minutes. This car made no effort to do anything that was evasive, which one would expect if somebody was being followed by a police car in a stolen car. Then they stopped. They actually stopped before they got pulled over because they thought the car behind them wanted to pass. They immediately got out of the car. They were fully compliant. We're familiar with the facts. You're actually over time, so let me see if my colleagues have any additional questions. Thank you. Thank you very much, counsel, for both sides for your helpful arguments today. The matter is submitted.
judges: THOMAS, NGUYEN, FORREST